**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| KAPILDEO SINGH, | : | |
| LAWRENCE DUMAIN, | : | |
| IRA WALLACH, | : | |
| BRIAN WALLACH, | : | |
| YVES SARRAZIN, | : | |
| ERLIN HILL, | : | |
| BRUCE SOULSBY, and | : | |
| ALAN WEISENBERG | : | |
|  | : | |
| **Plaintiffs,** | : | **CIVIL ACTION NO.** 3:21-cv-947 (LEK/ML) |
|  | : | |
| **v.** | : | |
|  | : | |
|  | : | **JURY TRIAL DEMANDED** |
| AMERICAN RACING- | : | |
| TIOGA DOWNS INC. | : | |
| d/b/a TIOGA DOWNS CASINO AND RACEWAY, | : | |
| AMERICAN RACING-VERNON DOWNS INC. | : | |
| d/b/a VERNON DOWNS RACETRACK, | : | |
| AMERICAN RACING AND | : | |
| ENTERTAINMENT, LLC, | : | |
| NEW MEADOWLANDS RACETRACK LLC. | : | |
| d/b/a MEADOWLANDS RACETRACK; | : | |
| and JEFFREY R. GURAL | : | |
| in his individual and official capacities | : | |
|  | : | |
| **Defendants.** | : | |

---

## COMPLAINT

Plaintiffs Kapildeo Singh ("Singh"), Lawrence Dumain ("Dumain"), Ira Wallach, Brian

Wallach, Yves Sarrazin ("Sarrazin"), Erlin Hill ("Hill"), Bruce Soulsby ("Soulsby"), and Alan

Weisenberg ("Weisenberg"), by and through their attorneys bring this action against American

Racing-Tioga Downs Inc., d/b/a as Tioga Downs Casino and Raceway ("Tioga"); American

Racing-Vernon Downs Inc. d/b/a Vernon Downs Racetrack ("Vernon"); American Racing and

Entertainment, LLC ("American Racing"); New Meadowlands Racetrack LLC d/b/a The

Meadowlands Racetrack ("The Meadowlands"), and Jeffrey R. Gural ("Gural") in both his individual and official capacities as a corporate officer of Tioga, Vernon, American Racing and Meadowlands, respectively, and hereby aver as follows:

## PARTIES

1.      Plaintiff Kapildeo Singh is a citizen of New York residing at 296 Lewis Ave., Yorktown Heights, NY 10598.

2.      Plaintiff Lawrence Dumain is a citizen of New York residing at 36 Boxberger Rd., Pine Bush, NY 12566.

3.      Plaintiff Ira Wallach is a citizen of New Jersey residing at 46 Robinhood Ave, Closter, NJ 07624.

4.      Plaintiff Brian Wallach is a resident of New Jersey residing at 74 Trautwein Crescent, Closter, NJ 07624.

5.      Plaintiff Yves Sarrazin is a citizen of Quebec, Canada residing at 634 Rang 5 La. Presentation, QC J0H 1B0.

6.      Plaintiff Erlin Hill is a citizen of Ontario, Canada residing at 1697 Cayuga Rd, Ohsweken, ON N0A 1M0.

7.      Plaintiff Bruce Soulsby is a citizen of Ohio residing at 9865 Kingston Circle, Powell, OH 43065.

8.      Plaintiff Alan Weisenberg is a citizen of Ohio residing at 3829 Lakedale Drive, Grove City, OH 43026.

9.      Defendant Tioga is a New York Corporation with its principal place of business located at 2384 West River Road, Nichols, NY.

10.     Defendant Vernon is a New York Corporation with its principal place of business located at 4229 Shulman Road, Vernon, NY.

11.     Defendant American Racing is a New York limited liability company with its principal place of business at 2384 West River Road, Nichols, NY.

12.     Defendant Meadowlands is a Delaware limited liability company with its principal place of business located at the Meadowlands Sports Complex 50 State Route 120, East Rutherford, NJ.

13.     Defendant Gural is a citizen of New York with a residence at 300 Central Park W, Apt. 9E, New York, NY 10024.

14.     Gural is the CEO of American Racing.

15.     Gural is President of Meadowlands.

## JURISDICTION AND VENUE

16.     This Court has original jurisdiction over plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 as the claims herein are related and arise out of the same case and controversy.

17.     This court has jurisdiction pursuant to 15 U.S.C. § 4, as the claims herein arise under 15 U.S.C. § 1.

18.     Venue is proper under 18 U.S.C. §1391(b) because a substantial part of the events giving rise to the claims contained herein occurred in the Northern District of New York.

## FACTUAL BACKGROUND

a.   Plaintiffs' Racing Background

19.     Plaintiffs are/were owners of racing horses, including horses that they raced or intended to race at Tioga, Vernon and The Meadowlands.

20.     Plaintiffs Singh, Dumain, Sarrazin, and Soulsby each had ownership interests in the filly When Dovescry.  Sarrazin owned 60%, Singh owned 10%, Dumain owned 10% and Soulsby owned 10% of When Dovescry.  They intended to race When Dovescry during the 2021 racing season at Tioga, Vernon and/or The Meadowlands.

21.     When Dovescry is a champion filly who has earned well over $1,000,000 in purse money.  She is also extremely valuable as a broodmare.

22.     Plaintiffs Singh, Sarrazin Dumain and Soulsby had a business relationship with trainer Brett Pelling to train When Dovescry.

23.     Singh had ownership interests in other horses including a 50% interest in Springsteen, a 23.25% interest in Pub Crawl, a 33% interest in Sisters Choice, a 25% interest in Easy Rider and a 20% interest in Western Fame and Warrawee Whynot, and 40% of Marymount Hanover.

24.     Mr. Singh intended on racing all of the above horses during the 2021 racing season at Tioga, Vernon and/or The Meadowlands.

25.     Plaintiff Singh has a business relationship with trainers Julie Miller, Brett Pelling, Shane Triton and Yves Bergeron to train his horses.

26.     Dumain had ownership interests in numerous horses including a 25% interest in Just Joshing, a 20% interest in Nashville Elgenna, a 25% interest in L Dees Tapit, a 25% interest in L Dees Reward, a 30% interest in. Champagne Cocktail, a 25% interest in Je Suis Si Belle, a 33.33% interest Sister's Choice, a 16.66% interest in Clenched Fist and a 33.33% interest in Max Contract.

27.     Mr. Dumain intended on racing all the above horses during the 2021 racing season at Tioga, Vernon and/or The Meadowlands.

28.     Dumain also owned two horses in partnership with Gural himself. Mr. Dumain owned a 25% interest in Aela Jamieson and a 25% interest in Walneria's Star.

29.     Mr. Dumain intended to race the above horses during the 2021 racing season at Tioga, Vernon and/or The Meadowlands.

30.     Mr. Dumain had a business relationship with trainers Brett Pelling and Casey Coleman to train the above horses.

31.     Plaintiffs Ira Wallach and Brian Wallach owned a 13.75% interest in Lindy the Great and a 16.666% interest in Western Fame.

32.     The Wallachs intended on to race the above horses during the 2021 racing season at Tioga, Vernon and/or The Meadowlands.

33.     The Wallachs had a business relationship with trainers Daniel Renaud and Shane Triton to train the above horses.

34.     Plaintiff Hill owned an interest in the horse Uhtred, which he intended to race during the 2021 racing season at Tioga, Vernon and/or The Meadowlands.

35.     Plaintiff Hill had a business relationship with trainer Carmen Ruciello for training his horse.

36.     Plaintiff Soulsby also had an 25% interest in Springsteen, a 35% interest in Grand Swan, a 20% interest in Nicholas Beach, a 30% interest in Western Fame and the horse Warrawee Why Not.

37.     Plaintiff Soulsby intended on racing the above horses during the 2021 racing season at Tioga, Vernon and/or The Meadowlands.

38.     Plaintiff Soulsby had a business relationship with Brett Pelling, Shane Tritton and Jenn Bongiorino to train the above referenced horses.

39.     Plaintiff Weisenberg had a 10% interest in Grand Swan, a 10% in Nicholas Beach, and a 25% interest in Springsteen.

40.     Plaintiff Weisenberg intended on racing the above horses during the 2021 racing season at Tioga, Vernon and/or The Meadowlands.

41.     Plaintiff Weisenberg had a business relationship with Brett Pelling, Shane Tritton and Jenn Bongiorino to train the above referenced horses.

42.     Plaintiffs are all licensed and in good standing in New York and New Jersey with the New York Gaming Board and the New Jersey Racing Commission.  These licenses give them the right to compete at Tioga, Vernon and The Meadowlands.

43.     To participate as viable owners in the harness racing industry, Plaintiffs need to have the ability to stable and train their horses, qualify their horses in sanctioned qualifying races, and have the ability to enter in races throughout the New York and New Jersey region.

44.     In order to race horses in the lucrative stakes program at The Meadowlands, owners such as Plaintiffs must make continuing payments to keep their horses eligible.

45.     All Plaintiffs made the payments in February 2021 which were accepted by The Meadowlands.

b.  <u>Defendants' Position in the Harness Racing Market</u>

46.     Tioga, Vernon and The Meadowlands directly solicit horse owners and trainers from across the United States and internationally to compete in their stake's races.

47.     Tioga, Vernon and The Meadowlands comprise a significant share of the harness racing market in the Northeastern United States.

48.     Indeed, The Meadowlands is the premiere track in all of harness racing and no other venue offers an equivalent stakes program.

49.     Although Tioga, Vernon and The Meadowlands have some common ownership, they are direct competitors of each other and are entirely separate entities.

50.     Tioga and Vernon are located in New York and subject to the laws of the state of New York, while The Meadowlands is located in New Jersey and subject to its laws.

51.     Tioga, Vernon and The Meadowlands each have different Racing Secretaries who perform the task of filling race cards and allotting stalls.

52.     Each individual track maintains its own marketing campaigns, has separate identities on the internet, maintains different qualifications for horsemen to participate at their tracks, have distinct and different stabling features and application processes, along with different sources for creating their purse structures, and are separate and distinct in the racing products they offer.

53.     Tioga, Vernon and The Meadowlands compete against each other for customers to visit their tracks and place wagers, purchase food and beverage and otherwise engage in commerce. In addition, they compete to attract horse owners to race horses on their tracks. Indeed, the more owners who race their horses at these racetracks, the more competitive the races are and the more attractive the races are to the public.

54.     In addition to possessing an ownership interest in Tioga, Vernon, The Meadowlands and American Racing, Gural is also a direct competitor with Plaintiffs. He owns an interest in a number of horses that he races at Tioga, Vernon and/or The Meadowlands. Indeed, Gural maintains a stable of horses that he races at The Meadowlands.

c. The Boycott

55.     Gural conspired with Tioga, Vernon, American Racing, and The Meadowlands to use their dominant market position to exclude Plaintiffs from competing on their racetracks and within the harness racing market and did so to give Gural a competitive advantage.

56.     Gural has had a long-standing dispute with a horse trainer named Rene Allard ("Allard").

57.     Allard is currently under investigation and indictment for matters unrelated to anything involving Plaintiffs. As a result of this indictment, Allard does not train horses for racing at Tioga, Vernon, The Meadowlands or any other racetrack.

58.     Pursuant to an agreement with the U.S. Justice Department, Allard has been permitted to continue working with horses at a stable in Florida, as long as the horses are not intended to participate in races.

59.     Gural seized on the situation involving Allard stabling horses in Florida to reduce Gural's competition by excluding Plaintiffs and others from competing in races at Tioga, Vernon and The Meadowlands.

60.     On or about March 6, 2021, Gural issued a statement on behalf of Tioga, Vernon and The Meadowlands (the "March 6th Statement"). The March 6th Statement provided, in part, that:

> The Meadowlands, Tioga & Vernon Downs will exclude any horse being trained or that has been trained in [Rene Allard's Florida] stable in any stake and is actively investigating who owns the horses that are or have been in his stable this winter.
> Those owners who currently have or have had horses in Allard's stable this winter are advised that all horses owned wholly or in part by them will be excluded from participation in all Meadowlands, Tioga & Vernon Downs races and that all of horses owned wholly or in part by them will be deemed ineligible to for any/all Meadowlands, Tioga & Vernon Downs administered stakes races for a minimum of three years.
> If owners affected by the above are a minority partner on horses with owners that are not affected by the above and are being trained by accepted trainers, they must legitimately divest their interest in those horses, which will be required to be done and demonstrated to the satisfaction of The Meadowlands before the March 15 stakes payments will be accepted on those horses.

The March 6th Statement is attached hereto as exhibit A.

61.    That is, not only horses stabled by Allard were subject to the March 6th Statement, but all horses even partially owned by anyone who had even one horse stabled by Allard the previous winter were subject to the ban.

62.    None of the horses referenced in Paragraphs 18-24 above were stabled by Allard. However, Plaintiffs were among many owners subject to the terms of the March 6th Statement because some horses they had an interest in were stabled by Allard in Florida.

63.    Plaintiffs had no intention of racing any of their horses stabled by Allard, and instead only intended to race those horses who were trained by other trainers.

64.    The action contained in the March 6th Statement was taken against Plaintiffs and others even though there is currently no pending disciplinary action against Plaintiffs by any racing jurisdiction or authority, including the New York and New Jersey Racing Commissions, in conjunction with any license to own and race harness racehorses.

65.    Indeed, none of the Plaintiffs have ever committed any act or omission to warrant exclusion from Tioga, Vernon or The Meadowlands.

66.    Despite the categorical ban recited in the March 6th Statement on owners who had housed any of their horses in Allard's Florida Stable, Tioga, Vernon and The Meadowlands did not enforce it equally.

67.    Tioga, Vernon and The Meadowlands allowed a racing partnership, VIP Racing, to continue to participate in races on their tracks. Like Plaintiffs, VIP Racing had similarly sent horses to be stabled with Allard. Unlike Plaintiffs, VIP Racing was allowed to continue racing its horses. This shows that there was no principled reason to exclude Plaintiffs' horses from racing.

68.    After the March 6th Statement was issued, no further stakes payments were accepted for Plaintiffs' horses and the payments they had already made were forfeited.

69.     As a result of the March 6th Statement, Plaintiffs had one week from the March 6th Statement to sell their interests in many valuable horses; otherwise their co-owners would also have their valuable horses banned from participation for three years. Naturally, then, no co-owner not subject to the ban contained in the March 6th Statement would want to continue to be in partnership with anyone subject to the ban. This led to Plaintiffs having to sell their interests in their horses below market value, if they could find a buyer in that short timeframe at all.

70.     In addition to having to quickly sell their horses, Plaintiffs continue to not be allowed to compete at the tracks for the next three years, depriving them of their livelihood. This includes barring Plaintiffs from competing at the preeminent harness racing events at The Meadowlands for three years.

71.     In addition, the boycott of Plaintiffs limits their ability to participate at any other tracks as no other person will participate in ownership or training agreements with them since any horses they have an interest in are barred from Tioga, Vernon and The Meadowlands.

## COUNT I – GROUP BOYCOTT IN VIOLATION OF 15 U.S.C. § 1

72.     Paragraphs 1-71 are hereby incorporated herein by reference.

73.     The March 6th Statement is a concerted effort by Tioga, Vernon, American Racing, The Meadowlands, and Gural to boycott and/or refuse to deal with Plaintiffs and reduce competition within the harness racing market.

74.     The March 6th Statement is a clear agreement and conscious commitment between Tioga, Vernon, American Racing, The Meadowlands and Gural to reduce and limit competition within the horse racing industry and prevent Plaintiffs from competing therein.

75.     Tioga, Vernon, American Racing, The Meadowlands, and Gural are each separate and distinct entities capable of independent decision making.

76.     Tioga, Vernon, American Racing, and The Meadowlands control a significant share of the harness racing market.

77.     Tioga, Vernon, American Racing, and The Meadowlands control essential facilities within the harness racing market.

78.     Indeed, The Meadowlands holds a dominant position in harness racing with no other track having the quality of racing comparable to it.

79.     Plaintiffs have invested millions of dollars in high-end stakes horses, and to not be able to race those horses at Tioga, Vernon, and The Meadowlands significantly reduces the value of their horses.

80.     The boycott of Plaintiffs suppresses competition in the harness racing market to a significant degree.

81.     Indeed, not only are Plaintiffs and the many others subject to the March 6th Statement barred from participating at Tioga, Vernon and The Meadowlands for three years, the ban effectively limits them from entering into agreements to own and/or train other horses for racing at other tracks since the horse would be banned from Tioga, Vernon and the preeminent harness racing track, The Meadowlands.

82.     In addition, there is no pro-competitive basis for the boycott. As a general rule, the race tracks compete for more owners to enter their horses into races in order to increase competition and consumption by the public. Defendants' actions decrease the number of competitors in their races and therefore reduces competition at Tioga, Vernon, American Racing, and The Meadowlands.

83.     This boycott does, however, produce a financial benefit for Gural, as Gural is a direct competitor of Plaintiffs because he races his own horses.  Gural benefits from the concerted

action of Tioga, Vernon, American Racing, and The Meadowlands while the market suffers from reduced competition.

84.     Thus, the boycott excluding Plaintiffs and others results in decreased competition in the relevant market.  The market for competitive harness racing was injured both nationally and at the Defendants' tracks by preventing substantial competitors from participating at the Defendant tracks.

85.     The exclusion of Plaintiffs and others from Tioga, Vernon, and The Meadowlands precludes them from racing for purse monies, stabling at the tracks, accessing the grounds of the tracks for training and qualifying purposes, participating in sanctioned qualifying races and in turn denies and hinders them in their ability to enter their horses in races at any track in the New York and New Jersey region.

86.     Thus, the group boycott causes a restraint of trade with an effect on interstate commerce in violation of 15 U.S.C. § 1.

WHEREFORE, Plaintiffs demand judgment against all Defendants in their favor awarding them damages, treble damages, attorney's fees and any other relief the Court deems just.

## COUNT II – GROUP BOYCOTT IN VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 340

87.     Paragraphs 1-86 are hereby incorporated herein by reference.

88.     The March 6th Statement is a concerted effort by Tioga, Vernon, American Racing, The Meadowlands, and Gural to boycott and/or refuse to deal with plaintiffs and reduce competition within the harness racing market.

89.     The March 6th Statement is a clear agreement and conscious commitment between Tioga, Vernon, American Racing, The Meadowlands, and Gural to reduce and limit competition within the horse racing industry and prevent Plaintiffs from competing therein.

90.     Tioga, Vernon, American Racing, The Meadowlands, and Gural are each separate and distinct entities capable of independent decision making.

91.     Tioga, Vernon, American Racing, and The Meadowlands control a significant share of the harness racing market.

92.     Tioga, Vernon, American Racing, and The Meadowlands control essential facilities within the harness racing market.

93.     The boycott of Plaintiffs suppresses competition in the harness racing market to a significant degree.

94.     Indeed, not only are Plaintiffs barred from participating at Tioga, Vernon, and The Meadowlands for three years, the ban effectively prohibits them from entering into agreements to own and/or train other horses for racing at other tracks since the horse would be banned from Tioga, Vernon, and the preeminent racetrack, The Meadowlands.

95.     In addition, there is no pro-competitive basis for the boycott. As a general rule, the race tracks compete for more horse owners to enter their horses to increase competition and consumption by the public. Defendants' actions decrease the number of competitors in their races and therefore reduce competition at Tioga, Vernon, American Racing, and The Meadowlands.

96.     This boycott does, however, produce a financial benefit for Gural, as Gural is a direct competitor of Plaintiffs because he races his own horses.  Gural benefits from the concerted action of Tioga, Vernon, American Racing, and The Meadowlands while the market suffers from reduced competition.

97.     Thus, the boycott excluding Plaintiffs results in decreased competition in the relevant market.  The market for competitive harness racing was injured in New York and at the

Defendants' tracks by preventing substantial competitors from participating at the Defendant tracks.

98.     The exclusion of Plaintiffs from Tioga, Vernon, and The Meadowlands precludes them from racing for purse monies, stabling at the tracks, accessing the grounds of the tracks for training and qualifying purposes, participating in sanctioned qualifying races and in turn denies and hinders them in their ability to enter their horses in races at any track in the New York region.

99.     Thus, the group boycott causes a restraint of trade in violation of New York General Business Law § 340.

WHEREFORE, Plaintiff's demand judgment against all Defendants in their favor awarding them damages, treble damages, attorney's fees and any other relief the Court deems just.

## COUNT III - TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP – KAPILDEO SINGH AND BUSINESS PARTNERS

100.    Paragraphs 1-99 are incorporated herein by reference.

101.    Singh was party to certain contracts granting him an ownership interest in the horses When Dovescry, Springsteen, Pub Crawl, Sisters Choice and Easy Rider.

102.    Tioga, Vernon, American Racing, Meadowlands, and Gural were aware of these contractual relationships.

103.    Defendants improperly interfered with Singh's contractual relationships by issuing the March 6th Statement prohibiting Singh from racing.

104.    The March 6th Statement would have barred Singh and his co-owners from racing the above referenced horses unless Singh sold his interest in the horses. Thus his co-owners would not rationally want to continue their ownership contracts with Singh.

105.    The March 6th Statement was issued without valid cause or justification and was intended to disrupt Singh's contractual relationship with his co-owners.

106.    As a result of Defendants' actions, Singh was forced to sell his interest in his five horses, resulting in significant pecuniary loss.

WHEREFORE, Plaintiff demands judgment in his favor against all Defendants awarding him damages, punitive damages and any other relief the Court deems just.

## COUNT IV - TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP – KAPILDEO SINGH AND TRAINERS

107.    Paragraphs 1-107 are incorporated herein by reference.

108.    Singh was party to certain contracts to engage trainers Julie Miller, Brett Pelling, Shane Triton and Eve Bergeron.

109.    Tioga, Vernon, American Racing, Meadowlands, and Gural were aware of these contractual relationships.

110.    Defendants improperly interfered with Singh's contractual relationships by issuing the March 6th Statement prohibiting Singh from racing.

111.    The March 6th Statement would have barred Singh from racing the above referenced horses unless Singh sold his interest in the horses.

112.    As a result of having to sell his horses, Mr. Singh was forced to terminate his contracts with the trainers.

113.    By forcing Mr. Singh to sell his horses and terminate the contracts with the trainers for those horses, the trainers refused to continue to do business with Mr. Singh.

114.    Mr. Singh's existing contractual relationships were destroyed and his prospective contractual relationships were destroyed as well, resulting in significant pecuniary loss.

115.    The March 6th Statement was issued without valid cause or justification and was intended to disrupt Singh's contractual relationship with his trainers.

WHEREFORE, Plaintiff demands judgment in his favor against all Defendants awarding him damages, punitive damages and any other relief the Court deems just.

### COUNT V – TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP – LAWRENCE DUMAIN AND BUSINESS PARTNERS

116.    Paragraphs 1-115 are incorporated herein by reference.

117.    Dumain was party to certain contracts granting him an ownership interest in the horses When Dovescry, Just Joshing, Nashville Elgenna, L Dees Tapit, L Dees Reward, Champagne Cocktail, Je Suis Si Belle, Sister's Choice, Clenched Fist and Max Contract.

118.    Dumain was a party to certain contracts granting him an ownership interest in the horses Aela Jamieson and Walneria's Star in which Gural also had an ownership interest.

119.    Tioga, Vernon, American Racing, The Meadowlands and Mr. Gural were aware of these contractual relationships.

120.    Defendants improperly interfered with Dumain's contractual relationships by issuing the March 6th Statement prohibiting Dumain from racing.

121.    The March 6th Statement would have barred Dumain and his co-owners from racing the above referenced horses unless Dumain sold his interest in the horses. Thus his co-owners would not rationally want to continue their ownership contracts with Dumain.

122.    The March 6th Statement was issued without valid cause or justification and was intended to disrupt Dumain's contractual relationship with his co-owners.

123.    As a result of Defendants' actions, Dumain was forced to sell his interest in his horses, resulting in significant pecuniary loss.

WHEREFORE, Plaintiff demands judgment in his favor against all Defendants awarding him damages, punitive damages and any other relief the Court deems just.

## COUNT VI – TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP – LAWRENCE DUMAIN AND TRAINERS

124.   Paragraphs 1-123 are incorporated herein by reference.

125.   Dumain was party to certain contracts to engage trainers Brett Pelling and Casey Coleman.

126.   Tioga, Vernon, American Racing, Meadowlands, and Gural were aware of these contractual relationships.

127.   Defendants improperly interfered with Dumain's contractual relationships by issuing the March 6th Statement prohibiting Dumain from racing.

128.   The March 6th Statement would have barred Dumain from racing the above referenced horses unless Dumain sold his interest in the horses.

129.   As a result of having to sell his horses, Mr. Dumain was forced to terminate his contracts with the trainers.

130.   By forcing Mr. Dumain to sell his horses and terminate the contracts with the trainers for those horses, the trainers refused to continue to do business with Mr. Dumain.

131.   Mr. Dumain's existing contractual relationships were destroyed and his prospective contractual relationships were destroyed as well, resulting in significant pecuniary loss.

132.   The March 6th Statement was issued without valid cause or justification and was intended to disrupt Dumain's contractual relationship with his trainers.

WHEREFORE, Plaintiff demands judgment in his favor against all Defendants awarding him damages, punitive damages and any other relief the Court deems just.

## COUNT VII – TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP – IRA AND BRIAN WALLACH AND BUSINESS PARTNERS

133.    Paragraphs 1-132 are incorporated herein by reference.

134.    Ira and Brian Wallach were party to certain contracts granting them an ownership interest in the horses Lindy the Great and Western Fame.

135.    Tioga, Vernon, American Racing, The Meadowlands, and Gural were aware of these contractual relationships.

136.    Defendants improperly interfered with the Wallachs' contractual relationships by issuing the March 6th Statement prohibiting the Wallachs from racing.

137.    The March 6th Statement would have barred the Wallachs and their co-owners from racing the above referenced horses unless the Wallachs sold their interest in the horse. Thus their co-owners would not rationally want to continue their ownership contracts with the Wallachs.

138.    The March 6th Statement was issued without valid cause or justification and was intended to disrupt the Wallachs' contractual relationship with their co-owners.

139.    As a result of Defendants' actions, the Wallachs were forced to sell their interest in their horses, resulting in significant pecuniary loss.

    WHEREFORE Plaintiff demands judgment in his favor against all Defendants awarding him damages, punitive damages and any other relief the Court deems just.

## COUNT VIII – TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP – IRA AND BRIAN WALLACH AND TRAINERS

140.    Paragraphs 1-139 are incorporated herein by reference.

141.    The Wallachs were party to certain contracts to engage trainers Daniel Renaud, Julie Miller and Shane Triton.

142.    Tioga, Vernon, American Racing, Meadowlands, and Gural were aware of these contractual relationships.

143.    Defendants improperly interfered with the Wallachs' contractual relationships by issuing the March 6th Statement prohibiting the Wallachs from racing.

144.    The March 6th Statement would have barred the Wallachs from racing the above referenced horses unless the Wallachs sold their interest in the horses.

145.    As a result of having to sell their horses, the Wallachs were forced to terminate their contracts with the trainers.

146.    By forcing the Wallachs to sell their horses and terminate the contracts with the trainers for those horses, the trainers refused to continue to do business with the Wallachs.

147.    The Wallachs' existing contractual relationships were destroyed and their prospective contractual relationships were destroyed as well, resulting in significant pecuniary loss.

148.    The March 6th Statement was issued without valid cause or justification and was intended to disrupt the Wallachs' contractual relationship with their trainers.

WHEREFORE, Plaintiff demands judgment in his favor against all Defendants awarding him damages, punitive damages and any other relief the Court deems just.

### COUNT IX – TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP – BRUCE SOULSBY AND BUSINESS PARTNERS

149.    Paragraphs 1-148 are incorporated herein by reference.

150.    Soulsby was a party to certain contracts granting him an ownership interest in the horses Springsteen, When Doves Cry, Nicholas Beach, Western Fame and Grand Swan.

151.    Tioga, Vernon, American Racing, The Meadowlands and Mr. Gural were aware of these contractual relationships.

152.    Defendants improperly interfered with Soulsby's contractual relationships by issuing the March 6th Statement prohibiting Soulsby from racing.

153.    The March 6th Statement would have barred Soulsby and his co-owners from racing the above referenced horses unless Soulsby sold his interest in the horses. Thus his co-owners would not rationally want to continue their ownership contracts with Soulsby.

154.    The March 6th Statement was issued without valid cause or justification and was intended to disrupt Soulsby's contractual relationship with his co-owners.

155.    As a result of Defendants' actions, Soulsby was forced to sell his interest in his horses, resulting in significant pecuniary loss.

WHEREFORE Plaintiff demands judgment in his favor against all Defendants awarding him damages, punitive damages and any other relief the Court deems just.

## COUNT X – TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP – BRUCE SOULSBY AND TRAINERS

156.    Paragraphs 1-155 are incorporated herein by reference.

157.    Soulsby was party to certain contracts to engage trainers Brett Pelling, Shane Tritton and Jenn Bongiorino

158.    Tioga, Vernon, American Racing, Meadowlands, and Gural were aware of these contractual relationships.

159.    Defendants improperly interfered with Soulsby 's contractual relationships by issuing the March 6th Statement prohibiting Soulsby from racing.

160.    The March 6th Statement would have barred Soulsby from racing the above referenced horses unless Soulsby sold his interest in the horses.

161.    As a result of having to sell his horses, Mr. Soulsby was forced to terminate his contracts with the trainers.

162.    By forcing Mr. Soulsby to sell his horses and terminate the contracts with the trainers for those horses, the trainers refused to continue to do business with Mr. Soulsby.

163.    Mr. Soulsby's existing contractual relationships were destroyed and his prospective contractual relationships were destroyed as well, resulting in significant pecuniary loss.

164.    The March 6th Statement was issued without valid cause or justification and was intended to disrupt Soulsby's contractual relationship with his trainers.

    WHEREFORE Plaintiff demands judgment in his favor against all Defendants awarding him damages, punitive damages and any other relief the Court deems just.

### COUNT XI – TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP – ALAN WEISENBERG AND BUSINEESS PARTNERS

165.    Paragraphs 1-164 are incorporated herein by reference.

166.    Weisenberg was a party to certain contracts granting him an ownership interest in the horses Springsteen, Nicholas Beach, and Grand Swan.

167.    Tioga, Vernon, American Racing, The Meadowlands and Mr. Gural were aware of these contractual relationships.

168.    Defendants improperly interfered with Weisenberg's contractual relationships by issuing the March 6th Statement prohibiting Weisenberg from racing.

169.    The March 6th Statement would have barred Weisenberg and his co-owners from racing the above referenced horses unless Weisenberg sold his interest in the horses. Thus his co-owners would not rationally want to continue their ownership contracts with Weisenberg.

170.    The March 6th Statement was issued without valid cause or justification and was intended to disrupt Weisenberg's contractual relationship with his co-owners.

    WHEREFORE Plaintiff demands judgment in his favor against all Defendants awarding him damages, punitive damages and any other relief the Court deems just.

### COUNT XII – TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP – ALAN WEISENBERG AND TRAINERS

171.    Paragraphs 1-170 are incorporated herein by reference.

172.    Weisenberg was party to certain contracts to engage trainers Brett Pelling, Shane Tritton and Jenn Bongiorino

173.    Tioga, Vernon, American Racing, Meadowlands, and Gural were aware of these contractual relationships.

174.    Defendants improperly interfered with Weisenberg 's contractual relationships by issuing the March 6th Statement prohibiting Weisenberg from racing.

175.    The March 6th Statement would have barred Weisenberg from racing the above referenced horses unless Weisenberg sold his interest in the horses.

176.    As a result of having to sell his horses, Mr. Weisenberg was forced to terminate his contracts with the trainers.

177.    By forcing Mr. Weisenberg to sell his horses and terminate the contracts with the trainers for those horses, the trainers refused to continue to do business with Mr. Weisenberg.

178.    Mr. Weisenberg's existing contractual relationships were destroyed and his prospective contractual relationships were destroyed as well, resulting in significant pecuniary loss.

179.    The March 6th Statement was issued without valid cause or justification and was intended to disrupt Weisenberg's contractual relationship with his trainers.

WHEREFORE Plaintiff demands judgment in his favor against all Defendants awarding him damages, punitive damages and any other relief the Court deems just.

### COUNT XIII – TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP – ERLIN HILL AND TRAINERS

180.    Paragraphs 1-179 are incorporated herein by reference.

181.    Hill was party to certain contracts to engage trainers such as Carmen Ruciello.

182.    Tioga, Vernon, American Racing, Meadowlands, and Gural were aware of these contractual relationships.

183.    Defendants improperly interfered with Hill's contractual relationships by issuing the March 6th Statement prohibiting Hill from racing.

184.    The March 6th Statement would have barred Hill from racing the above referenced horses unless Hill sold his interest in the horses.

185.    As a result of having to sell his horses, Mr. Hill was forced to terminate his contracts with the trainers.

186.    By forcing Mr. Hill to sell his horses and terminate the contracts with the trainers for those horses, the trainers refused to continue to do business with Mr. Hill.

187.    Mr. Hill's existing contractual relationships were destroyed and his prospective contractual relationships were destroyed as well, resulting in significant pecuniary loss.

188.    The March 6th Statement was issued without valid cause or justification and was intended to disrupt Hill's contractual relationship with his trainers.

WHEREFORE, Plaintiff demands judgment in his favor against all Defendants awarding him damages, punitive damages and any other relief the Court deems just.

### COUNT XIV– TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP – YVES SARRAZIN AND BUSINESS PARTNERS

189.    Paragraphs 1-188 are incorporated herein by reference.

190.    Sarrazin was party to certain contracts granting him an ownership interest in the horse When Dovescry.

191.    Tioga, Vernon, American Racing, The Meadowlands, and Gural were aware of this contractual relationship.

192.    Defendants improperly interfered with Sarrazin's contractual relationships by issuing the March 6th Statement prohibiting Sarrazin from racing.

193.    The March 6th Statement would have barred Sarrazin and his co-owners from racing the above referenced horse unless Sarrazin sold his interest in the horse. Thus his co-owners would not rationally want to continue their ownership contracts with Sarrazin.

194.    The March 6th Statement was issued without valid cause or justification and was intended to disrupt Sarrazin's contractual relationship with his co-owners.

195.    As a result of Defendants' actions, Sarrazin was forced to sell his interest in the horse, resulting in significant pecuniary loss.

### COUNT XV – TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP – YVES SARRAZIN AND TRAINERS

196.    Paragraphs 1-195 are incorporated herein by reference.

197.    Sarrazin was party to certain contracts to engage trainer Brett Pelling.

198.    Tioga, Vernon, American Racing, Meadowlands, and Gural were aware of these contractual relationships.

199.    Defendants improperly interfered with Sarrazin's contractual relationships by issuing the March 6th Statement prohibiting Sarrazin from racing.

200.    The March 6th Statement would have barred Sarrazin from racing the above referenced horses unless Sarrazin sold his interest in the horses.

201.    As a result of having to sell his horses, Mr. Sarrazin was forced to terminate his contracts with the trainer.

202.    By forcing Mr. Sarrazin to sell his horses and terminate the contracts with the trainer for those horses, the trainer refused to continue to do business with Mr. Sarrazin.

203.   Mr. Sarrazin's existing contractual relationships were destroyed and his prospective

contractual relationships were destroyed as well, resulting in significant pecuniary loss.

204.   The March 6th Statement was issued without valid cause or justification and was intended

to disrupt Sarrazin's contractual relationship with his trainers.

WHEREFORE, Plaintiff demands judgment in his favor against all Defendants awarding

him damages, punitive damages and any other relief the Court deems just.

Respectfully Submitted:
/S/

_____

Andrew J. Mollica, Esq.
Bar Role # 517596
1205 Franklin Ave. Suite 16LL
Garden City, NY 11530
(516) 528-1311 - cell (preferred)
(516) 208-3012 - office
(516) 673-4134 - fax
jdmol@aol.com

Alan Pincus, Esq. (*pro-hac-vice* admission pending)
2128 Weybridge Common
Holland, PA 18966
(702) 286-4340
kelso642000@yahoo.com

Date: August 20, 2021