UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

KAPILDEO SINGH, *et al.*,

                    Plaintiffs,

    -against-                             3:21-CV-0947 (LEK/ML)

AMERICAN RACING-TIOGA
DOWNS INC. d/b/a TIOGA DOWNS
CASINO AND RACEWAY, *et al.*,

                    Defendants.

_____

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

Plaintiffs Kapildeo Singh, Lawrence Dumain, Ira Wallach, Brian Wallach, Yves Sarrazin, Erlin Hill, Bruce Soulsby, and Alan Weisenberg bring this civil action against Defendants American Racing-Tioga Downs Inc. d/b/a as Tioga Downs Casino and Raceway ("Tioga"); American Racing-Vernon Downs Inc. d/b/a Vernon Downs Racetrack ("Vernon"); American Racing and Entertainment, LLC ("American Racing"); New Meadowlands Racetrack LLC d/b/a The Meadowlands Racetrack ("the Meadowlands") ("Tioga," "Vernon," and "the Meadowlands" collectively referred to as the "racetracks"), and Jeffrey R. Gural ("Gural"). See Dkt. No. 1 ("Complaint"). Presently before the Court is Defendants' motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. See Dkt. Nos. 10 ("Motion to Dismiss"), 10-1 ("Defendants' Memorandum of Law"), 16 ("Opposition"), 17 ("Reply"), 19 ("Plaintiffs' Sur-Reply"), 20 ("Defendants' Sur-Reply"). For the reasons that follow, the Court grants the Motion to Dismiss.

## II.     BACKGROUND

### A.  Factual History

The following factual allegations contained in the Complaint are assumed to be true. See

Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 76 (2d Cir. 2015).

### 1.  The Parties

Plaintiffs are/were owners of racing horses, including horses that they raced or intended

to race at the racetracks. Compl. ¶ 19. Plaintiffs had ownership interests in horses they intended

to race during the 2021 racing season at the racetracks. Id. ¶¶ 20, 23–24, 26–29, 31–32, 34,

36–37, 39–40. Additionally, Plaintiffs had business relationships with trainers to train their

respective horses. Id. ¶¶ 22, 25, 30, 33, 35, 38, 41. Plaintiffs are licensed and in good standing in

New York and New Jersey with the New York Gaming Board and the New Jersey Racing

Commission. Id. ¶ 42. These licenses give Plaintiffs the ability to compete at the racetracks. Id.

To participate in the harness racing industry, Plaintiffs need to have the ability to stable and train

their horses, qualify their horses in sanctioned qualifying races, and have the ability to enter into

races throughout the New York and New Jersey region. Id. ¶ 43. Furthermore, in order to race in

the lucrative stakes program at the Meadowlands, Plaintiffs must make continuing payments to

keep their horses eligible, and Plaintiffs made these payments in February 2021. Id. ¶¶ 44–45.

The racetrack defendants directly solicit horse owners and trainers from across the United

States and internationally to compete in their stake's races. Id. ¶ 46. These racetracks allegedly

comprise a significant share of the harness racing market in the Northeastern United States.  Id. ¶

47. Tioga, Vernon, and the Meadowlands are direct competitors of each other and are separate

entities even though they have some common ownership. Id. ¶¶ 49, 51–53.

Defendant Gural is the CEO of American Racing and President of Meadowlands. Id. ¶¶ 14–15. Gural possesses an ownership interest in the racetracks and American Racing, and also owns interests in a number of horses that he races at the above race tracks. Id. ¶¶ 28, 54.

### 2. Allard Situation and Boycott

Rene Allard is a horse trainer who is currently under investigation and indictment, and as a result of this indictment, Allard does not train horses for racing at any race track. Id. ¶ 57. Pursuant to an agreement with the U.S. Department of Justice, Allard was permitted to work with horses at a stable in Florida provided that the horses are not intended to participate in races. Id. ¶ 58. Plaintiffs allege that Gural used this information as a pretext to reduce his competition by excluding Plaintiffs and others from competing in races at the race tracks. Id. ¶ 59. On March 6, 2021, Gural issued a statement on behalf of Tioga, Vernon, and the Meadowlands:

> The Meadowlands, Tioga & Vernon Downs will exclude any horse being trained or that has been trained in [Rene Allard's Florida] stable in any stake and is actively investigating who owns the horses that are or have been in his stable this winter.

> Those owners who currently have or have had horses in Allard's stable this winter are advised that all horses owned wholly or in part by them will be excluded from participation in all Meadowlands, Tioga & Vernon Downs races and that all of horses owned wholly or in part by them will be deemed ineligible to for any/all Meadowlands, Tioga & Vernon Downs administered stakes races for a minimum of three years.

> If owners affected by the above are a minority partner on horses with owners that are not affected by the above and are being trained by accepted trainers, they must legitimately divest their interest in those horses, which will be required to be done and demonstrated to the satisfaction of The Meadowlands before the March 15 stakes payments will be accepted on those horses.

Id. ¶ 60; Compl. Ex. A ("March 6th Statement").

3

Plaintiffs allege that they and other owners were subject to the terms of the March 6th Statement because some horses they had interests in were stabled by Allard. Compl. ¶ 62. This was the case even if Plaintiffs had no intention of racing the horses stabled by Allard. Id. ¶ 63. Plaintiffs further contend that the March 6th Statement's ban was not equally enforced. Id. ¶¶ 66–67. No further stakes payments were accepted for Plaintiffs' horses and the payments they had already made were forfeited. Id. ¶ 68. Plaintiffs had to quickly sell their interests in their horses below market value, and Plaintiffs continue to not be allowed to compete at the tracks for the next three years. Id. ¶¶ 69–70.

Plaintiffs allege the following: (1) group boycott in violation of 15 U.S.C. § 1; (2) group boycott in violation of New York General Business Law § 340; and (3) various tortuous interference with a contractual relationship claims. Id. ¶¶ 72–204.

### B. Procedural History

On August 23, 2021, Plaintiffs filed their Complaint against Defendants. See Compl. On October 27, 2021, Defendants filed their Motion to Dismiss. See Mot. to Dismiss. On November 24, 2021, after the parties submitted their initial briefing, the Court requested that the parties submit additional briefing on whether Plaintiffs have antitrust standing. See Dkt. No. 18. The parties promptly filed their sur-replies. Pls.' Sur-Reply; Defs.' Sur-Reply.

### III. LEGAL STANDARD

### A. Rule 12(b)(6) Motion to Dismiss

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v.

<u>Twombly</u>, 550 U.S. 544, 570 (2007)); <u>see also</u> Fed. R. Civ. P. 12(b)(6). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of a plaintiff. <u>See</u> <u>Allaire Corp. v. Okumus</u>, 433 F.3d 248, 249–50 (2d Cir. 2006). A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim to relief that is plausible on its face." <u>Twombly</u>, 550 U.S. at 570. Plausibility requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." <u>Id.</u> at 556. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." <u>Iqbal</u>, 556 U.S. at 678 (citing <u>Twombly</u>, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 555). Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pleaded facts, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. <u>See id.</u> at 678–79.

### B.  Antitrust Standing

"It is a well-established principle that, while the United States is authorized to sue anyone violating the federal antitrust laws, a private plaintiff must demonstrate 'standing.'" <u>Daniel v. Am. Bd. of Emergency Med.</u>, 428 F.3d 408, 436 (2d Cir. 2005). In a recent opinion, the Second Circuit reiterated that "[a]ntitrust standing is a threshold, pleading-stage inquiry" and "when a complaint by its terms fails to establish this requirement we must dismiss it as a matter of law." <u>In re Am. Express Anti-Steering Rules Antitrust Litig.</u>, No. 20-1766, 2021 WL 5441263, at *4 (2d Cir. Nov. 22, 2021) (quoting <u>Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.</u>, 711 F.3d 68, 75 (2d Cir. 2013)). Plaintiffs must demonstrate antitrust standing whether they seek monetary or

injunctive relief. <u>Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.</u>, 467 F.3d 283, 290 (2d Cir. 2006).

A private plaintiff must show two elements to demonstrate antitrust standing: (1) "it suffered a special kind of antitrust injury" and that (2) "it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an efficient enforcer of the antitrust laws." <u>In re Am. Express Anti-Steering Rules Antitrust Litig.</u>, 2021 WL 5441263, at *4 (quoting <u>Gatt Commc'ns, Inc.</u>, 711 F.3d at 76) (internal quotation marks omitted)).

"Generally, only those that are participants in the defendants' market can be said to have suffered antitrust injury." <u>In re Aluminum Warehousing Antitrust Litig.</u>, 833 F.3d 151, 158 (2d Cir. 2016). The Second Circuit has also recognized an "inextricably intertwined" exception. <u>See id.</u> at 158–63. If a plaintiff is a market participant or satisfies the "inextricably intertwined" exception, then the Court must employ the Second Circuit's three-part test for determining whether a plaintiff has alleged an antitrust injury:

> First, the party asserting that it has been injured by an illegal anticompetitive practice must identify the practice complained of and the reasons such a practice is or might be anticompetitive. Next, we identify the actual injury the plaintiff alleges . . . [which] requires us to look to the ways in which the plaintiff claims it is in a worse position as a consequence of the defendant's conduct. Finally, we compare the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges. It is not enough for the actual injury to be causally linked to the asserted violation. Rather, in order to establish antitrust injury, the plaintiff must demonstrate that its injury is of the type the antitrust laws were intended to prevent and that flows from that which makes or might make defendants' acts unlawful.

<u>Gatt Commc'ns, Inc.</u>, 711 F.3d at 76 (alterations, citations, and internal quotation marks omitted).

If a plaintiff clears the antitrust-injury hurdle, the Second Circuit employs a four-factor test to determine whether a plaintiff is an "efficient enforcer." The factors include: (1) "the directness or indirectness of the asserted injury," (2) "the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement," (3) "the speculativeness of the alleged injury," and (4) "the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries." IQ Dental Supply, Inc. v. Henry Schein, Inc., 924 F.3d 57, 65 (2d Cir. 2019). "These four factors need not be given equal weight: the relative significance of each factor will depend on the circumstances of the particular case." Id.

### C.  Section 1 of the Sherman Act[1]

Section 1 of the Sherman Act makes it illegal to enter into a "contract, combination . . . or conspiracy" to restrain trade or commerce. 15 U.S.C. § 1. "To establish a [Section] 1 violation, a plaintiff must produce evidence sufficient to show: (1) a combination or some form of concerted action between at least two legally distinct economic entities; and (2) such combination or conduct constituted an unreasonable restraint of trade either per se or under the rule of reason." Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 95–96 (2d Cir. 1998).

---

[1]  Plaintiffs do not allege that Defendants violated Section 2 of the Sherman Act. The elements of a claim under Section 2 of the Sherman Act are: "(1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy." Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co., 812 F.2d 786, 795 (2d Cir. 1987) (internal quotation marks omitted). "A Section 1 violation is legally distinct from that under [Section] 2." Sitts v. Dairy Farmers of Am., Inc., 417 F. Supp. 3d 433, 464 (D. Vt. 2019) (quoting United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 224 n.59) (internal quotation marks omitted).

A district court within the Second Circuit recently explained the difference between the per se and rule of reason approaches:

> In evaluating potential Sherman Act violations, courts employ "two complementary categories of antitrust analysis." Nat'l Soc. of Prof'l Engineers v. United States, 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). The first category includes agreements that are "illegal per se" because their "nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." Id. The second category includes "agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." Id. For this second category of analysis, courts apply the rule of reason. Bogan v. Hodgkins, 166 F.3d 509, 514 (2d Cir. 1999).

PharmacyChecker.com, LLC v. Nat'l Ass'n of Boards of Pharmacy, 530 F. Supp. 3d 301, 343 (S.D.N.Y. 2021). "Per se violations include, for example, horizontal and vertical price-fixing; division of a market into territories; certain tying arrangements; and some group boycotts involving concerted refusals to deal with a competitor." Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 542–43 (2d Cir. 1993) (internal citations omitted). Plaintiffs allege that Defendants' actions amount to a group boycott and/or a refusal to deal. Compl. ¶ 73. However, a "group boycott" and a "refusal to deal" are "analytically identical." Concord Assocs., L.P. v. Ent. Properties Tr., No. 12-CV-1667, 2014 WL 1396524, at *11 (S.D.N.Y. Apr. 9, 2014) (citing Intellective, Inc. v. Massachusetts Mut. Life Ins. Co., 190 F. Supp. 2d 600, 616 (S.D.N.Y. 2002)), aff'd, 817 F.3d 46 (2d Cir. 2016).

Moreover, the Supreme Court has said that "precedent limits the per se rule in the boycott context to cases involving horizontal agreements[2] among direct competitors." NYNEX Corp. v.

_____

[2] "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different

8

Discon, Inc., 525 U.S. 128, 135 (1998). The Second Circuit also clarified that "NYNEX . . . squarely held that a horizontal agreement is a prerequisite in a group boycott case." PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 110 (2d Cir. 2002). In other words, if there is no horizontal agreement among direct competitors, then there can be no group boycott and the per se rule is inapplicable. See Concord Assocs., L.P., 2014 WL 1396524, at *11 (first citing Solent Freight Servs., Ltd. Inc. v. Alberty, 914 F. Supp. 2d 312, 320 (E.D.N.Y. 2012); and then citing Team Obsolete Ltd. v. A.H.R.M.A. Ltd., 216 F.R.D. 29, 38 (E.D.N.Y. 2003)).

## IV.   DISCUSSION

### A.  Matters Outside the Pleadings

As an initial matter, Plaintiffs ask the Court "to strike all factual averments [relied upon by Defendants] not contained in Plaintiffs' Complaint and additionally ask this Court not to consider any such facts." Opp'n at 3–4. In their Reply, Defendants argue that the public records from Allard's criminal prosecution may be considered because they are integral to Plaintiff's claims and because they are not used to assess the truth of the matters stated. Reply at 1–2.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a court may consider the following matters outside the four corners of the complaint: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are 'integral' to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case." Lane v. Tilbe, No. 18-CV-0438, 2018

_____

levels of distribution as vertical restraints." Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 730 (1988).

WL 6289668, at *2 (N.D.N.Y. Dec. 3, 2018) (internal citations omitted) (Kahn, J.). Here,

Plaintiffs attached the March 6th Statement to their Complaint. See March 6th Statement. The

Exhibit made references to Allard, various indictments, and performance enhancing drugs. See

id. At this time, although skeptical of Plaintiffs' argument, the Court does not need to consider

the contested factual averments in ruling on the Motion to Dismiss.

**B. Antitrust Standing**

Plaintiffs argue that they suffered an antitrust injury and are efficient enforcers, Pls.' Sur-

Reply at 4–7, while Defendants argue that Plaintiffs lack antitrust standing because they suffered

no antitrust injury and are not efficient enforcers, Defs.' Sur-Reply at 3–8. The Court agrees that

Plaintiffs have established antitrust standing.[3]

*1. Gatt Antitrust Injury Analysis*

Before turning to the Gatt three-part test for determining whether a plaintiff has alleged

an antitrust injury, the Court must determine whether Plaintiffs are market participants or satisfy

the "inextricably intertwined" exception.

The Second Circuit has explained that:

> The upshot is that to suffer antitrust injury, the putative plaintiff must
> be a participant in the very market that is directly restrained. Usually,
> that market is the one in which the defendant operates, such as when
> the plaintiff is a competitor or consumer of the defendant, but
> sometimes the defendant will corrupt a separate market in order to
> achieve its illegal ends, in which case the injury suffered can be said
> to be "inextricably intertwined" with the injury of the ultimate target.
> Regardless, antitrust injury is suffered by participants in the restrained
> market (or markets).

---

[3] To the extent Plaintiffs argue that they sufficiently pleaded an antitrust injury by relying
on the "essential facilities" doctrine, Opp'n at 6, the Court does not need to consider this
argument.

In re Aluminum Warehousing Antitrust Litig., 833 F.3d at 161.

The Court finds that Plaintiffs plausibly allege that they participated in "any of the markets in which the defendants operate." Id. The racetracks directly solicit horse owners (like Plaintiffs) to compete in their stake's races. Compl. ¶ 46. Although the racetracks do not directly compete with Plaintiffs,[4] the racetracks are more akin to consumers of Plaintiffs' labor. The racetracks "compete [against each other] to attract horse owners to race horses on their tracks." Id. ¶ 53. For their part, Plaintiffs compete for, among other things, purse monies. Id. ¶ 85.

There is no question that the March 6th Statement's ban took place in the harness racing market, "and that is where the direct, immediate impact [was] felt [by Plaintiffs]." In re Aluminum Warehousing Antitrust Litig., 833 F.3d at 162. Plaintiffs were now precluded "from racing for purse monies, stabling at the tracks, accessing the grounds of the tracks for training and qualifying purposes, [and] participating in sanctioned qualifying races. . . ." Compl. ¶ 85.

a.  Step 1

"At the first step of the Gatt analysis, [Plaintiffs] need allege only that the Defendants have engaged in unlawful anticompetitive conduct." IQ Dental Supply, Inc., 924 F.3d at 63. "The bar for such a showing is a low one." Id. Thus, the Court finds that Plaintiffs have satisfied this requirement by plausibly alleging that Defendants' March 6th Statement's ban served as a boycott of Plaintiffs. See Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 212 (1959) ("Group boycotts . . . have long been held to be in the forbidden category [under the antitrust laws].").

---

[4] Defendant Gural, on the other hand, is a direct competitor. Compl. ¶ 83. As for American Racing, it is unclear from the Complaint what role American Racing plays in the harness racing market, but the Court will assume for now that it too is a market participant.

11

                    b.  Step 2

        "The second Gatt step requires [the Court] to isolate and identify [Plaintiffs'] 'actual

injury' or the 'ways in which the plaintiff claims it is in a "worse position" as a consequence of

the defendant's conduct.'" IQ Dental Supply, Inc., 924 F.3d at 63 (quoting Gatt Commc'ns Inc.,

711 F.3d at 76).

        Plaintiffs claim that they are in a worse position than they were before the boycott

because "they are prohibited from participating in the harness racing market; they have lost their

property; they have been deprived of valuable business relationships; and they have lost

foreseeable income/profits." Pls.' Sur-Reply at 5. Defendants' supplemental briefing is silent on

whether Plaintiffs are in a worse position; instead they argue that Plaintiffs failed to plausibly

allege that Defendants' conduct caused any competitive harm. Defs.' Sur-Reply at 3.[5]

        The Second Circuit in IQ Dental explained that for Gatt Step 2:

                Antitrust law is concerned with market conditions. Assuming that IQ
                is operating in a market affected by anticompetitive conduct, the

---

        [5]  In a footnote, Defendants argue that Plaintiffs have alleged a two-sided market (horse
owners and racing fans), and that Plaintiffs cannot establish antitrust injury because they "have
only alleged harm to themselves and have not considered net harms to the two-sided market
considered as a whole." Defs.' Sur-Reply at 4 n.3. The Court disagrees for several reasons. First,
the argument was made in a footnote and was not properly placed before the Court. See Young
America's Foundation v. Stenger, No. 20-CV-0822, 2021 WL 3738005, at *15 (N.D.N.Y. Aug.
24, 2021) (Kahn, J.). Second, the Court is not convinced that Plaintiffs have alleged a two-sided
market. Although the racetracks connect the market of horse fans to the market of horse owners,
the network effects based on the Complaint's allegations run mainly in one direction: "the more
owners who race their horses at these racetracks, the more competitive the races are and the more
attractive the races are to the public." Compl. ¶ 53. The Complaint provides no allegations
regarding why the horse owners would care how many racing fans there are. Third, Defendants
rely upon Ohio v. Am. Express Co., 138 S. Ct. 2274, 2280 (2018) for their two-sided market
standing argument, but as the Second Circuit recently held: "Importantly, American Express did
not directly address antitrust standing at all." Salveson v. JPMorgan Chase & Co., 860 F. App'x
207, 209 (2d Cir. 2021).

                                            12

> question of actual injury becomes whether IQ is worse off than it
> would be if the market were free of anticompetitive forces. IQ
> has alleged that the Defendants' anticompetitive conduct affected
> the market, and that, after it entered the market, its sales through
> SourceOne suffered as a result.

IQ Dental Supply, Inc., 924 F.3d at 64 (internal citation omitted and emphasis added).

The Court construes Gatt Step 2 as having two requirements: (1) plaintiffs must plausibly allege violations of market-wide harm, or in other words, an injury to competition;[6] and (2) plaintiffs must plausibly allege that they are "worse off than it would be if the market were free of anticompetitive forces."

As to the first requirement, Plaintiffs' Complaint adequately alleges an injury to competition. The Complaint includes allegations that the March 6th Statement's ban "reduce[s] competition within the harness racing market." Compl. ¶ 73. The reasoning is that "[a]s a general rule, the race tracks compete for more owners to enter their horses into races in order to increase competition and consumption by the public" and "Defendants' actions decrease the number of competitors in their races and therefore reduces competition at Tioga, Vernon, American Racing, and The Meadowlands." Id. ¶ 82.

---

[6] The Court notes that district courts within the Second Circuit have not been consistent with regard to the step of the Gatt analysis in which a court should consider whether a plaintiff plausibly plead an injury to competition. See, e.g., Sell It Soc., LLC v. Acumen Brands, Inc., No. 14-CV-3491, 2015 WL 1345927, at *4 (S.D.N.Y. Mar. 20, 2015) (considering it mainly at Step 1), Arcesium, LLC v. Advent Software, Inc., No. 20-CV-4389, 2021 WL 1225446, at *7 (S.D.N.Y. Mar. 31, 2021) (considering it at Step 2). In some cases, courts still consider whether a plaintiff plausibly alleges an antitrust injury even if they do not explicitly follow the Gatt three-step process. See, e.g., Bhanusali v. Orange Reg'l Med. Ctr., No. 10-CV-6694 CS, 2013 WL 4828657, at *9 (S.D.N.Y. Aug. 12, 2013), aff'd in part, vacated in part, 572 F. App'x 62 (2d Cir. 2014), Ramnarine v. Nationstar Mortg., LLC, No. 19-CV-5544, 2019 WL 7038430, at *3 (E.D.N.Y. Dec. 20, 2019).

Here, for purposes of the motion, Plaintiffs' Complaint plausibly alleges a sufficient injury for the antitrust standing analysis when it alleges Defendant Gural conspired with the other defendants to exclude Plaintiffs (and other horse owners who were impacted by the ban) from competing on the racetracks and within the harness racing market. Id. ¶¶ 55, 74. Other courts have agreed that the prevention of marketwide competition is an "injury of the type the antitrust laws were designed to prevent." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977); see, e.g., Intellective, 190 F. Supp. 2d at 613 ("Intellective adequately states an antitrust injury in this regard [because] Intellective alleges that it, and all others, are prevented from competing in the relevant market by the Working Group's control of the data necessary to perform a competing study."), Clarett v. Nat'l Football League, 306 F. Supp. 2d 379, 403 (S.D.N.Y. 2004), rev'd on other grounds, 369 F.3d 124 (2d Cir. 2004) ("Clarett has a demonstrable antitrust injury for precisely the same reason [as Intellective]: he alleges that the Rule prevents him, and all others similarly situated, from competing in the relevant market."); HM Compounding Servs., Inc. v. Express Scripts, Inc., No. 14-CV-1858, 2015 WL 4162762, at *10 (E.D. Mo. July 9, 2015) ("[F]or purposes of a motion to dismiss, [the plaintiff] has sufficiently pled an antitrust injury by asserting that [the defendant] excluded it as a competitor from the marketplace.").

As to the second requirement, which Defendants do not contest, the Court agrees that Plaintiffs have sufficiently alleged they are worse off than they would be if the market were free of anticompetitive forces (i.e. no March 6th Statement ban). See Pls.' Sur-Reply at 5.

c.  Step 3

Finally, at the last step, Plaintiffs "must demonstrate that the Defendants' anticompetitive behavior caused its actual injury." IQ Dental Supply, Inc., 924 F.3d at 64–65 (citing Gatt Commc'n Inc., 711 F.3d at 76). "In other words, the nature of Plaintiff's injury (or the market-wide harm they allege) must be caused by Defendants' anticompetitive actions and not by something else." Arcesium, 2021 WL 1225446, at *8. Plaintiffs easily allege the necessary causal relationship because Plaintiffs' own injuries—their inability to compete in the market—stem from the March 6th Statement's ban.

2.  Efficient Enforcer Analysis

Plaintiffs argue that they are efficient enforcers of the antitrust laws because they satisfy all four factors, Pls.' Sur-Reply at 7, while Defendants assert that Plaintiffs are not efficient enforcers because the injuries are "speculative and are unconnected with the antitrust violation they allege," Defs.' Sur-Reply at 7–8. The Court finds that Plaintiffs plausibly allege that they are efficient enforcers of the antitrust laws.

"Directness in the antitrust context means close in the chain of causation." Gatt Commc'ns, Inc., 711 F.3d at 78. This factor turns on "familiar principles of proximate causation." Lotes Co. v. Hon Hai Precision Indus. Co., 753 F.3d 395, 412 (2d Cir. 2014). Regarding the first factor, Plaintiffs' injuries are relatively clear and direct: horse owners like Plaintiffs who were subject to the ban in the March 6th Statement were directly impacted by it. The first factor weighs in favor of Plaintiffs.

"The second factor simply looks for a class of persons naturally motivated to enforce the antitrust laws." In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 689 (2d Cir. 2009).

15

"Inferiority to other potential plaintiffs can be relevant, but it is not dispositive." <u>Id.</u> (internal quotation marks omitted). Here, it is not apparent whether there are more direct victims of the alleged conspiracy than Plaintiffs. Rather, Plaintiffs are "the most-motivated plaintiff with respect to the Defendants' alleged direct boycott" because Plaintiffs are the immediate victims of the March 6th Statement. <u>IQ Dental Supply, Inc.</u>, 924 F.3d at 68. The second factor also weighs in favor of Plaintiffs.

Under the third factor, the Court asks whether there would be "a high degree of speculation in a damages calculation." <u>Id.</u> at 66–67. Additionally, the fourth factor "traditionally concerns the prospect of different groups of plaintiffs attempting to recover for the same exact injury." <u>Fund Liquidation Holdings LLC v. UBS AG</u>, No. 15-CV-5844, 2021 WL 4482826, at *7 (S.D.N.Y. Sept. 30, 2021). However, the Supreme Court has noted that the "potential difficulty in ascertaining and apportioning damages is not . . . an <u>independent</u> basis for denying standing where it is adequately alleged that a defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects." <u>Lexmark Int'l, Inc. v. Static Control Components, Inc.</u>, 572 U.S. 118, 135 (2014). Moreover, "[a]t the motion to dismiss stage, any holding that these damages would be speculative is premature." <u>In re Foreign Exch. Benchmark Rates Antitrust Litig.</u>, No. 13-CV-7789, 2016 WL 5108131, at *11 (S.D.N.Y. Sept. 20, 2016). There may be considerable challenges in the calculation of damages, but at this time, the Court finds that this factor is neutral. As for the fourth factor, there is no indication that Defendants' conduct was subject to government and regulatory investigations, meaning that "[t]here is nothing before this Court demonstrating that any of the Plaintiffs have received payments as a result of those proceedings. . . ." <u>Fund Liquidation Holdings LLC</u>, 2021 WL 4482826, at *7. Plus, "there are

16

various ways to protect against duplicate recoveries or apportionment issues in this action." Id. As a result, the fourth factor weighs in favor of Plaintiffs.

On balance, at the pleading stage, Plaintiffs plausibly allege that they are efficient enforcers of the antitrust laws.

### C.  Section 1 of the Sherman Act

Having established that Plaintiffs can demonstrate antitrust standing, the Court will turn to the merits of the parties' arguments. Defendants argue that (1) Plaintiffs failed to plead concerted action; (2) Plaintiffs' claims are not entitled to per se treatment; and (3) Plaintiffs' claims fail under a rule of reason analysis. Defs.' Mem. of Law at 10–13, 15–18. The Court finds that because Plaintiffs did not adequately allege the relevant market, the antitrust claim must fail and the Court does not need to resolve whether Plaintiffs failed to plead concerted action, whether the claims are subject to the per se rule[7], and whether the claims fail under a per se or rule of reason analysis.

### 1. Relevant Market

---

[7]  "[C]ourts have long recognized the existence of 'hub-and-spoke' conspiracies in which an entity at one level of the market structure, the 'hub,' coordinates an agreement among competitors at a different level, the 'spokes.'" United States v. Apple, Inc., 791 F.3d 290, 314 (2d Cir. 2015) (quoting Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc., 602 F.3d 237, 255 (3d Cir. 2010)). "Existing case law makes clear that a hub-and-spoke theory is cognizable under Section 1 only if there are both vertical agreements between the hub and each spoke, and also a horizontal agreement among the various spokes with each other." In re Zinc Antitrust Litig., 155 F. Supp. 3d 337, 376 (S.D.N.Y. 2016) (citing Apple, 791 F.3d at 314). The per se rule can apply to "hub-and-spoke" conspiracies. See Preston Hollow Cap. LLC v. Nuveen LLC, No. 20-CV-5597, 2021 WL 3542255, at *14 (S.D.N.Y. Aug. 10, 2021). Although Plaintiffs do not explicitly refer to a "hub-and-spoke" conspiracy in the Complaint, the Court may determine at a later time that Gural acted as a "hub" and racetrack defendants as "spokes."

17

Regardless of what standard applies (per se or rule of reason), Plaintiffs "must articulate a relevant market." See Downtown Music Publishing LLC v. Peloton Interactive, Inc., 436 F. Supp. 3d 754, 765 & n.5 (S.D.N.Y. 2020). "The relevant market is broadly defined as 'the area of effective competition,' which is typically 'the arena within which significant substitution in consumption or production occurs.'" US Airways, Inc. v. Sabre Holdings Corp., 938 F.3d 43, 55 (2d Cir. 2019) (quoting Ohio v. Am. Express Co., 138 S. Ct. 2274, 2285 (2018)). "Market definition is ordinarily a deeply fact-intensive inquiry." Id. at 55 (quoting Todd v. Exxon Corp., 275 F.3d 191, 199 (2d Cir. 2001)). Accordingly, courts often "hesitate to grant motions to dismiss for failure to plead a relevant . . . market." Todd, 275 F.3d at 199–200. Still, the Second Circuit has explained that "[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products," "the relevant market is legally insufficient and a motion to dismiss may be granted." Sabre, 938 F.3d at 64 (quoting Chapman v. New York State Div. for Youth, 546 F.3d 230, 238 (2d Cir. 2008)).[8]

Here, Plaintiffs purport to define the relevant market as the harness racing market in the Northeastern United States. Compl. ¶ 47. However, after carefully reviewing the Complaint, the Court finds that Plaintiffs made no effort to explain the alleged market with reference "to the rule

---

[8] Although Chapman dealt with Section 2 of the Sherman Act, other courts in this Circuit have applied Chapman's rationale to Section 1 claims. See, e.g., Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp., No. 13-CV-0029, 2014 WL 3728591, at *9 (S.D.N.Y. July 28, 2014), aff'd, 624 F. App'x 23 (2d Cir. 2015), Planetarium Travel, Inc. v. Altour Int'l, Inc., 97 F. Supp. 3d 424, 428 (S.D.N.Y.), aff'd, 622 F. App'x 40 (2d Cir. 2015), Peloton Interactive., 436 F. Supp. 3d at 765.

of reasonable interchangeability and cross-elasticity of demand," and the Court must grant the motion to dismiss. See Global Discount Travel Servs. v. Trans World Airlines, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) ("plaintiff's failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal."); Full Circle United, LLC v. Skee-Ball, Inc., No. 11-CV-5476, 2014 WL 12829195, at *10 (E.D.N.Y. May 13, 2014) ("Regardless, since FC fails to 'define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand,' the pleading is 'legally insufficient and a motion to dismiss may be granted.'") (quoting Chapman, 546 F.3d at 238); In re AMR Corp., 527 B.R. 874, 884 (Bankr. S.D.N.Y. 2015) ("Failure to define the market by reference to the rule of interchangeability is, standing alone, valid grounds for dismissal."). Instead, Plaintiffs refer to the Meadowlands as "the premiere track in all of harness racing and no other venue offers an equivalent stakes program" and that it "holds a dominant position in harness racing with no other track having the quality of racing comparable to it." Compl. ¶¶ 48, 78. Still, the Second Circuit has noted that "[m]erely asserting that a commodity is in some way unique is insufficient to plead a relevant market." Concord Assocs., L.P., 817 F.3d at 54 (quoting B.V. Optische Industrie De Oude Delft v. Hologic, Inc., 909 F. Supp. 162, 171 (S.D.N.Y. 1995)). The alleged uniqueness of the Meadowlands does not relieve Plaintiffs of their requirement to refer to the rule of interchangeability in the Complaint when "[t]here is no discussion of other products in the market that potentially compete with the [Meadowlands or the other racetracks], of arguably competing products that should not be included the market, or of the factors that make the [Meadowlands or the other racetracks] a unique market." Mathias v. Daily News, L.P., 152 F. Supp. 2d 465, 481–82 (S.D.N.Y. 2001).

19

### D.  Remaining State Law Claims

Because Plaintiffs have not alleged diversity jurisdiction, Compl. ¶ 16, this Court would only have subject matter jurisdiction to consider Plaintiffs' state law claims to the extent that supplemental jurisdiction is provided for under 28 U.S.C. § 1367. Subsection (c) of that section provides that "district courts may decline to exercise supplemental jurisdiction over a [state law] claim . . . [if] the district court has dismissed all claims over which it has original jurisdiction" 28 U.S.C. § 1367(c). Where, as here, any federal claims have been dismissed at a relatively early stage of litigation, courts often decline to exercise subject matter jurisdiction. See Valencia ex rel. Franco v. Lee, 316 F.3d 299, 306 (2d Cir. 2003); Tops Markets, Inc., 142 F.3d at 103 ("[W]hen all federal claims are eliminated in the early stages of litigation, the balance of factors generally favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them without prejudice.") (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)). The Court elects to do so here. The Court dismisses the state law claims without prejudice for lack of subject matter jurisdiction.

## V.     CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion to Dismiss (Dkt. No. 10) is **GRANTED**; and it is further

**ORDERED**, that Plaintiffs' Complaint (Dkt. No. 1) is **DISMISSED WITHOUT PREJUDICE**; and it is further

**ORDERED**, that the Clerk of the Court is directed to close this action; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      December 28, 2021
            Albany, New York

            _____
            LAWRENCE E. KAHN
            United States District Judge